# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

ELAYNE WOLF,

*Plaintiff,*

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, ET AL.,

*Defendants.*

CASE NO. 3:11-cv-00025

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

In this action, Plaintiff Elayne Wolf ("Wolf") seeks rescission of her home mortgage loan under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq*. On August 30, 2011, I denied Defendants' motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), finding that they were moot in light of Wolf's filing of an amended complaint on August 22, 2011. However, I gave Defendants leave to re-file their motions within fourteen days, which they in turn did. This matter is now before the Court upon consideration of Defendants' motions to dismiss Wolf's amended complaint. For the reasons that follow, I will grant Defendants' motions.

## I. BACKGROUND

As amended, the complaint alleges that Wolf owned a home in Charlottesville, Virginia, and that on May 14, 2007, she refinanced her home mortgage loan through MetroCities Mortgage, LLC ("MetroCities"). Her loan from MetroCities was evidenced by a note secured by a deed of trust, and was secured by a lien on the home. One purpose of the home loan was to enable Wolf to refinance debt she owed to Countrywide Home Loans ("Countrywide"). The deed of trust named Mortgage Electronic Systems, Inc. ("MERS") as the lender's nominee, and

MERS held legal title as to rights conveyed by the deed of trust and could take certain actions on behalf of the lender, including foreclosure.

Ultimately, Wolf defaulted under the terms of her mortgage loan, and, on or about March 12, 2010, she received a letter from the Law Offices of Shapiro & Burson, LLP informing her of her rights and alternatives to foreclosure. On March 30, 2010, MERS assigned the deed of trust to BAC Home Loans Servicing LP ("BAC"), a former subsidiary of Defendant Bank of America, N.A. ("Bank of America").[1]  On that same date BAC appointed Defendant Professional Foreclosure Corporation of Virginia ("PFC") as substitute trustee in place of the original trustee under the deed of trust, Michael J. Barrett ("Barrett").  BAC instructed PFC to foreclose, and PFC advertised a foreclosure sale for May 5, 2010.  On May 2, 2010, just a few days before the date of the scheduled foreclosure sale, Wolf attempted to rescind her mortgage loan pursuant to TILA by mailing a notice of rescission to BAC.  As a result, BAC temporarily cancelled the foreclosure sale; however, PFC did later conduct the foreclosure sale in July 2010.  Defendant Federal National Mortgage Association ("Fannie Mae") purchased the property at the foreclosure sale, and the property was transferred by trustee's deed to Fannie Mae on or about October 7, 2010.

Thereafter, Fannie Mae instituted an unlawful detainer action against Wolf in the General District Court of Albemarle County.  On March 18, 2011, the general district court entered an order awarding possession of the home to Fannie Mae.  Subsequently, Wolf timely perfected an appeal to the Circuit Court of Albemarle County for a trial *de novo*.[2]  Wolf filed her initial

---

[1] Effective July 1, 2011, BAC Home Loans Servicing LP merged with and into Bank of America, N.A., and lost any separate identity.

[2] That case is currently set for a jury trial on March 7, 2012.

complaint in this action on February 24, 2011 in the same court.  PFC removed the action to this Court on March 21, 2011.

In her amended complaint, Wolf submits that she is entitled to have the home loan on which she defaulted rescinded pursuant to TILA.  First, she alleges that the original lender, MetroCities, materially under-disclosed the applicable finance charge that was assessed as part of obtaining the loan.  Second, Wolf alleges that her right to rescind the loan itself was not properly disclosed.  In addition, Wolf asserts that both the assignment of the note from MERS to BAC and BAC's appointment of PFC as substitute trustee were invalid.  The amended complaint also arguably makes out claims for fraud (against Bank of America and PFC), defamation (against PFC), and breach of the implied covenant of good faith and fair dealing (against Bank of America).[3]  With respect to relief, Wolf requests the entry of a declaratory judgment that her notice of rescission is valid and an order returning the home's title to her.  Additionally, Wolf seeks statutory damages under TILA, compensatory and punitive damages, and attorney's fees.

## II.  STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a Rule 12(b)(6) motion, a court must accept all factual allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff.  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  Legal conclusions in the guise of factual allegations, however, are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950–51 (2009).  Although a complaint

---

[3] The claims are not separated into counts in the complaint.  Federal Rule of Civil Procedure 10(b) provides that if doing so "would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count or defense."

"does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and quotations omitted).  Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

In sum, Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S. Ct. at 1950.[4]  If, after accepting all well-pleaded allegations in the plaintiff's favor, it appears that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief, a motion to dismiss under Rule 12(b)(6) should be granted.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

### III. DISCUSSION

### A. TILA

In enacting TILA, Congress found "that economic stabilization would be enhanced . . . by the informed use of credit."  15 U.S.C. § 1601(a).  Accordingly, TILA's principal goal is the "meaningful disclosure of credit terms."  *Id.*  TILA's rescission provisions support this goal.  Generally, when a borrower enters into a consumer credit transaction secured by his principal residence, TILA's "buyer's remorse" provision grants a right of rescission, which the creditor must "clearly and conspicuously disclose" to the borrower.  15 U.S.C. § 1635(a).  The right of

---

[4] Federal Rule of Civil Procedure 10(c) provides that a copy of a written instrument that is an exhibit to a pleading, including a complaint, is deemed a part of that pleading.  *See Thompson v. Greene*, 427 F.3d 263, 268 (4th Cir. 2005); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  In evaluating a motion to dismiss, the court may consider documents extrinsic to the complaint if they are "integral to and explicitly relied on in the complaint." *Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222–23 (4th Cir. 2009) (citing *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)).  Here, Wolf explicitly references in her amended complaint several exhibits that were attached to it.  It is appropriate to consider those documents for the purpose of deciding these motions.

rescission may be exercised within three days of either closing, delivery of a notice of right to rescind, or delivery of all "material disclosures," whichever occurs last.  *Id.*; 12 C.F.R. §§ 226.23(a)(1)–(3).[5]  However, if the required notice or material disclosures are not provided, or are deficient in certain ways, the deadline for rescission is extended to three years.  *See* 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(a)(3).  The material disclosures provided to a borrower must "reflect the terms of the legal obligation between the parties."  12 C.F.R. § 226.17(c)(1).

TILA requires that the mortgage lender disclose the applicable finance charge for a mortgage, which is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."  15 U.S.C. § 1605(a).  Thus, the finance charge is the cost to the borrower of obtaining the loan, and includes such payments as interest, service charges, loan fees, and mortgage-broker fees.  *Id.*; *see also Hudson v. Bank of Am., N.A.*, No. 3:09-cv-462, 2010 WL 2365588, at *3 (E.D. Va. June 11, 2010) (defining "finance charge" under TILA).  In her amended complaint, Wolf alleges that MetroCities, the original lender, assessed three under-disclosed finance charges.  First, she claims that MetroCities imposed "a bogus $10 charge which was claimed to have been included in a charge disclosed to her as for recordation costs at the clerk's office but in fact not paid to the office of the clerk."  Am. Compl. ¶ 11(A)(i).  Second, Wolf states that MetroCities required a payment to Countrywide that was $1,195.44 in excess of what was owed to Countrywide.  Countrywide refunded the entire sum to Wolf after two months, but did not compensate Wolf for the interest on the excess sum, which Wolf calculates as $15.00 based on the note's interest rate.  Am. Compl. ¶ 11(A)(ii).  And third, Wolf maintains that MetroCities imposed an "excess" charge for casualty insurance that Wolf asserts "was at least $50 more than reasonable."  Am. Compl. ¶ 11(A)(iii).

---

[5] The regulations implementing TILA, which are codified at 12 C.F.R. § 226, are known as "Regulation Z."

In addition to disclosure of the finance charge, TILA also mandates that the lender accurately disclose the borrower's right to rescind the loan.  As previously mentioned, creditors must provide a notice that "clearly and conspicuously disclose[s]" the borrower's rescission rights.  15 U.S.C. § 1635(a); 12 C.F.R. § 226.15(a)–(b).  Clear and conspicuous disclosure is not, however, synonymous with perfect disclosure.  *See Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d 12, 16 (1st Cir. 2007); *Veale v. Citibank*, 85 F.3d 577, 581 (11th Cir. 1996).

In this case, MetroCities required Wolf to enter into an arbitration agreement as a condition of the loan.  Thereafter, Wolf was informed about her right to rescind that arbitration agreement as well as her right to rescind the loan itself.  Wolf's allegation is that the information provided for rescinding the arbitration agreement and for rescinding the credit transaction were "drastically" inconsistent, thus undermining the otherwise accurate information provided to Wolf about her right to rescind the loan.  Specifically, Wolf alleges that rescinding the arbitration agreement would have required her to send a cancellation notice to a different address with different information than that required for rescission of the loan as evidenced by the Notice of Right to Cancel.  Am. Compl. ¶ 11(B).  The effect, according to Wolf, was that the Notice of Right to Cancel was rendered "insufficiently clear to comply with the requirements of TILA." Pl.'s Mem. Opp'n to Mots. Dismiss at 22.[6]

Ultimately, I find it unnecessary to delve into the two aforementioned grounds on which Wolf has staked her claim to a right of rescission because that claim is time-barred and must be dismissed as a matter of law.

---

[6] It is undisputed that the Notice of Right to Cancel, taken alone, was in proper form.

1. <u>Rescission and the Limitations Period</u>

Under TILA, the borrower ordinarily has three days from the date of closing in which she may rescind the transaction in its entirety.  15 U.S.C. § 1635(a) ("[T]he obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section . . . .").  However, "[i]f the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first."  12 C.F.R. § 226.23(a)(3); *see also* 15 U.S.C. § 1635(f) ("An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon sale of the property, whichever comes first.").

Wolf maintains that the three-year limitations period should apply because, as previously outlined, she alleges that the financing charges were under-disclosed and that she was not properly informed of her right to rescind (because cancellation of the arbitration agreement could be achieved by sending a notice to an address different from the one listed in the Notice of Right to Cancel).  Although I decline to decide whether Wolf is even entitled to the three-year limitations period in this case, assuming, *arguendo*, that she is, her TILA rescission claim is still time-barred.  Wolf obtained her mortgage loan on May 14, 2007, and she mailed to BAC a notice of rescission on May 2, 2010.  However, Wolf did not file her initial complaint in the Circuit Court of Albemarle County until February 24, 2011.  Plainly, while the notice of rescission was sent within the three-year limitations period (again, assuming it actually applies), Wolf's suit seeking rescission was not filed within that period.  Thus, the question is whether the timeliness

of Wolf's action is measured by the date of her notice of rescission or of her filing of this lawsuit.

Quite recently, I confronted essentially the same facts, and I concluded that the three-year limitations period is absolute and "extinguishes the borrower's rescission right regardless of whether any notice of rescission was filed within three years of closing." *Yowell v. Residential Mortgage Solution, LLC*, No. 3:10-cv-00063, 2011 WL 3654388, at *9 (W.D. Va. Aug. 17, 2011), *appeal docketed*, No. 11-1994 (4th Cir. Sept. 20, 2011) (quoting *Bradford v. HSBC Mortgage Corp.*, No. 1:09cv1226, 2011 WL 3047490, at *6 (E.D. Va. July 22, 2011)).[7] Despite Wolf's suggestion to the contrary, I decline to overrule my decision in *Yowell* at this time. Consequently, Wolf's claim for rescission under TILA is time-barred even if the three-year limitations period were found to apply.

## 2. Damages and the Limitations Period

In addition to her claim seeking to enforce her rescission request, I find that Wolf's claim for damages under TILA is also barred by the applicable limitations period.  Under 15 U.S.C. § 1640(e), claims for damages pursuant to TILA expire one year after the occurrence of the violation.  Defendants assert that because the violations alleged by Wolf occurred, if at all, when the initial material disclosures were made for the loan on or about May 14, 2007 (the date the loan was obtained), they are clearly time-barred.  In response, Wolf specifies that her claim for damages is for failure to honor her notice of rescission, which occurred twenty days from BAC's receipt of it in May 2010.  *See* 15 U.S.C. § 1635(b) ("Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise . . . .").  In essence, then, Wolf argues that BAC's failure to proceed

---

[7] As noted, *Yowell* is on appeal to the United States Court of Appeals for the Fourth Circuit.  Wolf concedes that *Yowell* is "on all fours with this case on this issue, but asks the Court to reverse in this case the decision in that case on the issue of the limitations period for a TILA rescission claim."  Pl.'s Mem. Opp'n to Mots. Dismiss at 29.

according to § 1635(b) constitutes a separate TILA violation subject to the general one-year limitations period provided in § 1640(e).

In *Bradford*, the district court for the Eastern District of Virginia addressed this precise argument on the part of the plaintiff in that case, and concluded that it was flawed.  2011 WL 3047490 at *6.  The court observed that there was no reason to believe that "Congress would draft TILA so as to provide a borrower with two rescission claims, each with a different limitations period, but both for the purpose of achieving the same remedy under the same statute based on the same underlying statutory rescission right."  *Id.* at *7.  The appropriate construction of TILA "is that § 1635's statute of repose for rescission claims *specifically* carves out an exception to § 1640's one-year statute of limitations period for TILA claims *generally*.  Thus, the catch-all, one-year statute of limitations for TILA claims does not apply to rescission claims."  *Id.*  Indeed, it would be anomalous to give a plaintiff only three years to file a claim seeking to enforce a rescission request, but up to four years to seek damages based on such a request.  Accordingly, Wolf's claim for damages under TILA is also time-barred and must be dismissed.

### B.  Validity of MERS's Assignment

In addition to her TILA-based claims, Wolf challenges the propriety of the assignment from MERS to BAC.  In Wolf's view, the assignment was invalid for two reasons.  First, she contends that the deed of trust did not provide MERS with the right to assign the note.  Second, Wolf alleges that neither MERS nor BAC possessed the note when it was purportedly assigned because the note was, in fact, lost at that time.  Ultimately, I find both allegations lacking, and I address them in turn.

1. <u>Authority of MERS to Assign Its Rights</u>

At the outset, I note that Wolf is not a party to the assignment from MERS to BAC.  Am. Compl. Ex. B.  Similarly, Wolf is not an intended beneficiary of the assignment which is, to be sure, a contract.  *Id.*  Indeed, Wolf does not allege that she is either a party to the assignment or an intended beneficiary.  As such, she lacks standing to challenge the assignment's validity.  *See, e.g.*, *Velasco v. Security Nat'l Mortgage Co.*, CV. No. 10-00238, 2011 WL 4899935, at *4 (D. Haw. Oct. 14, 2011) (concluding that plaintiffs could not challenge an assignment from MERS to BAC because "[a]bsent an enforceable contract right, a party lacks standing to challenge the validity of the contract"); *see also* 6A C.J.S. *Assignments* § 132 (2011) (stating that a debtor may "assert against an assignee . . . any matters rendering the assignment absolutely invalid or ineffective . . . but, if the assignment is effective to pass title, the debtor cannot interpose defects or objections which merely render the assignment voidable at the election of the assignor or those standing in his or her shoes").[8]

In *Bridge v. Aames Capital Corp.*, No. 1:09 CV 2947, 2010 WL 3834059, at *4 (N.D. Ohio Sept. 29, 2010), the court held that a borrower could not attack the assignment of a mortgage note between the original lender and an assignee because the borrower was not a party to the assignment.  As in the instant case, there was no dispute in *Bridge* between the assignor and assignee with respect to the assignment's validity; rather, it was only the borrower who objected.  *Id.*  The *Bridge* court stated that "regardless of the outcome of this litigation, [borrower] is still in default on her mortgage and subject to foreclosure.  As a consequence, [borrower] has not suffered any injury as a result of the assignment . . . nor is there any likelihood that [borrower's] requested relief will prevent her alleged injury."  *Id.* at *5.

---

[8] Indeed, "[o]bligors of a claim may not defend on any ground which renders the assignment voidable only, because the only interest or right which an obligor of a claim has in the instrument of assignment is to insure him or herself that he or she will not have to pay the same claim twice." *Id.*

Similarly, Wolf does not have standing to challenge the validity of the assignment in this case: she was not a party to the assignment, and the assignment did not affect her underlying obligation to make timely payments.

Moreover, aside from her lack of standing, Wolf is simply mistaken with respect to the validity of the assignment.  The deed of trust securing the note, which Wolf executed, states in pertinent part:

> The beneficiary of this [deed of trust] is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. . . . Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right to execute any and all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

Am. Compl. Ex. A at 3.  Wolf contends that when MERS assigned its rights to BAC on March 30, 2010, it was impermissibly attempting to assign the debt itself.  Now, it is true that the note that Wolf signed evidencing the debt owed to MetroCities did not confer any rights on MERS or name MERS as a party to it.  However, MERS assigned its interests in the deed of trust—*not* the underlying note—to BAC.  Am. Compl. Ex. B ("FOR VALUE RECEIVED, [MERS] hereby assigned and transferred to [BAC] all right, title, and interest in and unto a certain Deed of Trust, dated May 14, 2007 and executed by [Wolf] . . . .").  Thus, MERS did not transfer to BAC the underlying debt owed to MetroCities, but rather its own limited rights (including the right to foreclose) as set forth in the debt of trust.  Such an agreement is not unlawful and was explicitly permitted by the terms of the deed of trust, which Wolf signed.  Recently, several different courts tasked with assessing the validity of similar assignments have concluded that MERS has the right to assign its rights under these mortgages or deeds of trust.  *See, e.g., Cervantes v. Countrywide*

*Home Loans, Inc.*, 656 F.3d 1034, 1042 (9th Cir. 2011); *Zinni v. Mortgage Elec. Registration Sys., Inc.*, No. 2:11-CV-1539, 2011 WL 5827197, at *2 (D. Nev. Nov. 18, 2011); *Velasco*, 2011 WL 4899935 at *5; *White v. BAC Home Loans Servicing, L.P.*, No. 4:10-CV-2094, 2011WL 1483901, at *6 (E.D. Mo. Apr. 19, 2011); *Larota-Florez v. Goldman Sachs Mortgage Co.*, 719 F. Supp. 2d. 636, 639–40 (E.D. Va. 2010), aff'd, No. 10-1523, 2011 WL 3203047 (4th Cir. Jul. 28, 2011).

Additionally, Wolf maintains that a deed of trust cannot be assigned as it was in this case because the rights under a deed of trust must "follow the note." Am. Compl. at ¶ 16. In support of this contention, Wolf cites generally, without particular reference, to *Horvath v. Bank of New York, N.A.*, 641 F.3d 617 (4th Cir. 2011). However, when the court in that case used the phrase "follows the note," it was merely reinforcing its ruling that a note and deed of trust do not receive different legal treatment and that the transfer of one does not split it from the other. *Id.* at 623–24. Indeed, as the *Horvath* court recognized, it is well-established that "in Virginia, as to common law securities, the law is that both deeds of trust and mortgages are regarded in equity as mere securities for the debt and whenever the debt is assigned the deed of trust or mortgage is assigned or transferred with it." *Williams v. Gifford*, 139 Va. 779, 784, 124 S.E.2d 403, 404 (1924) (citing *McClintic v. Wise's Adm'rs*, 66 Va. (25 Gratt.) 448, 1874 WL 5664 (1874)). Neither this long-settled aspect of the law in Virginia, nor anything in *Horvath*, stands for the proposition, argued for by Wolf, that rights under a deed of trust cannot ever be assigned.

## 2. The Unavailability of the Note

Wolf also contends that the assignment was invalid because on March 12, 2010—eighteen days before the formal assignment—Wolf received a letter from BAC's legal counsel informing her that the note was "unavailable at this time." Amend Compl. Ex. C. Wolf alleges

- 12 -

that this letter is evidence that the note was lost,[9] and she further asserts that neither MERS nor BAC had possession of the note on March 30 when the assignment was actually executed. Am. Compl. ¶ 24.[10] Wolf is correct that the issue of the note's possession is an important one because mere transfer of the deed of trust without possession of the note is a nullity. *See, e.g.*, *In re Lippold*, No. 11-12300, 2011 WL 3890540, at *3 (Bankr. S.D.N.Y. Sept. 6, 2011). Nonetheless, she has failed to allege sufficient facts to demonstrate that the note was lost or not ultimately within BAC's possession.

First, in the letter from Shapiro & Burson to Wolf, BAC is identified as the "Holder." Am. Compl. Ex. C. Second, BAC is listed in the document appointing PFC as substitute trustee as the "present holder or authorized agent of the holder of the Note secured by the below described Deed of Trust (hereinafter referred to as 'Noteholder')." Am. Compl. Ex. D. Third, and most importantly, PFC has stated both in its reply memorandum and at a hearing on its motion that it is currently in possession of the original note on behalf of Bank of America. Indeed, a copy of the note, which PFC attaches to its brief,[11] bears the endorsement of the original lender, MetroCities, to Countrywide Bank, N.A., then from Countrywide Bank, N.A. to

---

[9] Although Wolf alleges that the document stated that the note had been lost, the document was attached to the amended complaint as Exhibit C, and it states only that the note "is unavailable at this time." Where a conflict exists between "the bare allegations of the complaint and any attached exhibit, the exhibit prevails." *United States ex rel. Constructors, Inc. v. Gulf Ins. Co.*, 313 F. Supp. 2d 593, 596 (E.D. Va. 2004) (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)); *see also Anheuser-Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), *vacated and remanded on other grounds*, 517 U.S. 1206 (1996).

[10] Bank of America also urges that the statement that the note was unavailable as of March 12, 2010 is subject to the more benign interpretation that the note was not yet available to BAC, or that the note was not yet available to counsel for BAC, who authored the letter. However, at this stage, I consider the facts as alleged by Wolf to be true, and they need only plausibly support a claim in order to survive a motion to dismiss.

[11] This document may be considered at this stage for the purposes of the motions to dismiss and without having to convert those motions into ones for summary judgment because Wolf referred to the note in her amended complaint and it is central to her claims. *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006) (per curium) ("[A] court may consider official public records, documents central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed.").

Countrywide Home Loans, Inc. (which, significantly, became BAC), and then endorsed in blank by Countrywide Home Loans, Inc.  PFC's Reply Mem. Ex. A.[12]  In light of these facts, I find that BAC was the holder of the note and the assignee of MERS's rights under the deed of trust. Further, because PFC eventually came into possession of the note, it had authority to foreclose under Virginia law.[13]  Ultimately, Wolf has failed to allege sufficient facts to demonstrate that MERS's assignment to BAC of its rights under the deed of trust was invalid.

### C.  Validity of the Appointment of the Substitute Trustee

In her amended complaint, Wolf alleges that PFC "had no authority to proceed as substitute trustee and acted *ultra vires* in purporting to sell the home at foreclosure."  Am. Compl. ¶ 32(B).  As I just discussed, PFC has possession of the note on behalf of BAC, and BAC received from MERS, via the assignment, the right to foreclose.  Therefore, BAC could, once Wolf fell into arrears, direct PFC to conduct the foreclosure sale.  *See, e.g.*, *Larota-Florez*, 719 F. Supp. 2d at 640–41 (finding that MERS's assignee had authority to appoint PFC as trustee to sell the property at a foreclosure sale).  However, Wolf bases her allegation regarding the appointment's invalidity on different grounds.  Wolf contends that the notarized document effectuating the appointment was "bogus" because the second page was not attached to the first page when it was signed.  Because the pages were not attached, Wolf maintains, the second,

---

[12] In addition to the foregoing arguments, PFC argues that, at bottom, Wolf's amended complaint is nothing more than a "show me the note" claim, which is contrary to Virginia's non-judicial foreclosure laws.  PFC points out that Virginia law provides that a trustee may sell a property subject to a note secured by a deed of trust even where the note is lost or cannot be produced, as long as the person required to pay the instrument is given notice.  Va. Code § 55-59.1(B).  This provision does not address, however, the issue of whether a deed of trust may be assigned where the note is missing.  The fact that an inability to locate the deed of trust is not fatal to proceeding with foreclosure may suggest that an inability to locate the deed of trust is also not fatal to its assignment, but it does not provide a definitive answer.

[13] Under Virginia law, "[w]hen endorsed in blank, an instrument becomes payable to bearer and may be negotiated by transfer of possession alone until specially endorsed."  Va. Code at § 8.3A-205(b).  "An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."  *Id.* at § 8.3A-203(a).  Once in possession of the instrument, its holder is entitled to enforce it.  *Id.* at § 8.3A-301.

signed page "did not remove Barrett as trustee on the deed of trust and did not appoint PFC as substitute trustee."  Am. Compl. ¶ 26(B).

In support of this allegation, Wolf cites Virginia Code § 55-59(9), which states that "[w]hen the instrument of appointment has been executed, the substitute trustee or trustees named therein shall be vested with all of the powers, rights, authority, and duties vested in the trustee or trustees."  In light of § 55-59(9), Wolf argues that the second, signed page could not have served as an appointment of a substitute trustee because it contained no language to that effect; rather, all it contained was BAC's signature.  *See* Am. Compl. Ex. D.  As such, Wolf contends that there never was an executed document appointing PFC as substitute trustee, and "Virginia statutory law does not allow a purported substitute trustee to be appointed merely by intention of the lender."  Pl.'s Mem. Opp'n to Mots. Dismiss at 16.  However, Wolf does not allege any additional facts to support her claim that the appointment document is invalid.  For example, Wolf does not allege that the signature on the second page was forged or that the document taken as a whole misrepresented the intentions of either BAC or PFC.  Indeed, Wolf does even allege a factual basis for her otherwise unsubstantiated assertion that when the second page was signed, "it was a one page document, not associated with anything else (except it was stapled to something else that had nothing to do with the note, the deed of trust, or the loan)."  Am. Compl. ¶ 26(B).

Moreover, Wolf does not cite any case law for the notion that Virginia Code § 55-59(9) requires the instrument of appointment to be completely intact when it is executed.  In other words, Wolf has not supplied any authority for her position that all of the individual pages need to be stapled or clipped together when the page containing the signatory line is actually signed.  In fact, the only authority Wolf points to in this regard is *Stanley Dale Williams v. HSBC*

*Finance Corporation*, No. CL 10-877 (Va. Cir. Ct. Mar. 30, 2011).  In that case, the court did overrule the defendant's demurrer and found that the plaintiff had stated a claim upon which relief could be granted.  *Id* at 2.  However, the allegation in that case was that the two pages of a notarized document were not executed in the same place at the same time, calling into question whether the document had been executed personally in front of the notary.  *Id.*  Wolf does not allege, nor does she argue in her brief, that the two pages of the appointment were executed in different places or at different times (indeed, the first page does not contain any signatures); it is only asserted that the pages were not attached when the second page was signed.  Taken as true, this allegation, in itself, is inadequate to support Wolf's claim that the appointment of PFC as substitute trustee was invalid.

However, Wolf also argues that the appointment was invalid because she alleges that BAC was not a holder of the note at the time it appointed PFC.  In a letter dated August 23, 2010, Bank of America (which was still, at that point, a separate entity from BAC) identifies itself as "servicer" of Wolf's loan and names Fannie Mae as the "lender."  Am. Compl. Ex. F.  According to Wolf, the letter indicates that Fannie Mae, not BAC, was the noteholder.  Consequently, Wolf argues, BAC was also not the holder of the note when it appointed PFC as substitute trustee on March 30, 2010.

Again, though, Wolf has failed to allege sufficient facts.  Nothing in the August 23, 2010 letter indicates when Fannie Mae became the "lender" or, more importantly, whether Fannie Mae was the "lender" at the time of the appointment, nearly five months earlier.  In addition, as Bank of America observes, "lender" is undefined in the August 23, 2010 letter, and could have simply meant investor.  Indeed, Fannie Mae purchased the property at the foreclosure sale in July 2010 prior to the issuance of the letter in August.  Finally, as has been mentioned previously, in the

document effectuating the appointment of PFC, BAC is defined as "Noteholder."  Am. Compl. Ex. D.  Therefore, Wolf has not met her burden; a vague statement in the August 23, 2010 letter, by itself, cannot undermine the fact that BAC is described in the appointment document as the noteholder.[14]

### D.  Fraud

In her loosely-articulated cause of action for fraud, Wolf alleges that the creation of the document appointing PFC as substitute trustee was an act of fraud committed by BAC and PFC.  Wolf further alleges that due to her reliance on the validity of the appointment, she failed to take action to prevent foreclosure prior to the foreclosure sale, and that the foreclosure sale advertisement itself was a fraudulent representation because PFC did not have authority to act as substitute trustee.

Under Virginia law, a claim of actual fraud consists of: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.  *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218, 618 S.E.2d 316, 321 (2005).  In federal court, fraud claims are subject to a heightened pleading standard.  Federal Rule of Civil Procedure 9(b) requires a party alleging fraud to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The "circumstances" required to be pled with particularity under Rule 9(b) are "'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (internal citations omitted).  "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under

---

[14] *See also supra* Subsection III.B.2.

Rule 12(b)(6)." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 n.5 (4th Cir. 1999).

Ultimately, the facts pled by Wolf are insufficient to make out a claim for fraud against Bank of America (formerly known as BAC) and PFC because they do not allege a false representation of a material fact. The document appointing PFC as substitute trustee, regardless of whether its pages were attached when it was executed, captured the intent of both BAC and PFC to be bound by it. In other words, both BAC and PFC wanted PFC to take Barrett's place as trustee. And, as previously articulated, BAC had authority to appoint PFC. Therefore, neither entity falsely represented a material fact.

In addition, at no point does Wolf allege one of the requisite elements of a fraud claim: that Defendants had the intent to mislead her. Indeed, Defendants convincingly argue that they could not have done so given the fact that the document appointing PFC was recorded and a copy of it was mailed to Wolf. That the appointment of PFC as substitute trustee may have suffered from procedural irregularities—a contention that Defendants unequivocally deny—does not make it a false representation as required by Virginia law, nor one intended to mislead Wolf. Further, Wolf *did* take action to prevent the foreclosure sale, albeit belatedly, by requesting rescission of the note pursuant to TILA. Indeed, by the time PFC entered the scene, Wolf had already fallen into arrears on the note. Therefore, Wolf simply cannot argue that she relied on any misrepresentations to her detriment. Similarly, Wolf has failed under the requirements of Rule 9(Bb) to plead adequate facts to demonstrate that the advertisement of the foreclosure sale represented fraud. Wolf does not allege precisely what within that advertisement was false or misrepresented, nor does she sufficiently allege that either BAC or PFC had the intention of

defrauding her simply because they sought to foreclose on her home after she had defaulted, a step that she knew or should have known they would likely take.

Additionally, Bank of America (formerly BAC) argues that Wolf's common law fraud claims are barred by Virginia's economic loss rule. According to Bank of America, Wolf's claims arise from alleged fraud related to conduct governed by contracts—that is, the deed of trust and the note upon which Wolf is suing. Where alleged fraudulent conduct relates to contracts as such, a tort claim for fraud cannot lie. *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 425, 374 S.E.2d 55, 58 (1988) ("Tort law is not designed . . . to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement.") (citation omitted); s*ee also Augusta Mut. Ins. Co. v. Mason*, 274 Va. 199, 205–06, 645 S.E.2d 290, 294 (2007) (stating that fraudulent representations made during the performance of a contract do not give rise to a fraud claim); *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 559, 507 S.E.2d 344, 347 (1998) (holding that fraudulent performance of a contract does not give rise to a fraud claim because the source of any duty breached arises from the underlying contract). Under Virginia law, "losses suffered as a result of the breach of a duty assumed only by agreement, rather than a duty imposed by law, remain the sole province of the law of contract." *Filak v. George*, 267 Va. 612, 618, 594 S.E.2d 610, 613 (2004).

Thus, whether the economic loss doctrine applies requires a court to determine first "whether a cause of action sounds in contract or tort" by ascertaining "the source of the duty violated." *Richmond Metro. Auth.*, 256 Va. at 558, 507 S.E.2d at 347. Despite the aforementioned limitations on certain tort actions imposed by the economic loss rule, it is nonetheless true that "a single act or occurrence can, in certain circumstances, support causes of action both for breach of contract and for breach of a duty arising in tort." *Dunn Construction*

*Co. v. Cloney*, 278 Va. 260, 266, 682 S.E.2d 943, 946 (2009) (citation omitted).  In this vein, Wolf argues that the economic loss rule does not bar her fraud claims because the right to foreclose on a home is governed by "both the terms of a deed of trust and by Virginia statutory law."  Pl.'s Mem. Opp'n to Mots. Dismiss at 17.  In other words, the duty breached, according to Wolf, did not arise solely from underlying contracts with Defendants.  Therefore, Wolf maintains, her fraud claims can be pursued.

I, however, disagree.  Wolf's argument that the right to foreclose on a home is governed to a certain extent by Virginia statutory law is a red herring.  While it is true that the Virginia Code does, for example, provide a mechanism for the appointment of a substitute trustee, Wolf has failed to articulate precisely how her claims here do not sound in contract law.  Indeed, the note evidencing the loan, the deed of trust securing it, the assignment to BAC, and the appointment of PFC all represent contracts.  Moreover, any duty owed to Wolf by Defendants in this case does not exist absent an agreement between them.  The economic loss rule "is intended to preserve the bedrock principle that contract damages be limited to those within the contemplation and control of the parties in framing their agreement."  *Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 446 (4th Cir. 1990) (quotations omitted).  When, as here, a plaintiff alleges economic losses, she cannot recover in tort "simply by recasting a contract claim as a tort claim."  *Waytec Elec. Corp. v. Rohm and Haas Elec. Materials, LLC*, 459 F. Supp. 2d 480, 491 (W.D. Va. 2006).  Accordingly, Wolf's fraud claim must be dismissed.

## E. Defamation

Wolf's entire allegation of defamation is as follows:  "The actions of PFC in advertising the home for foreclosure sale, which it did for a planned foreclosure in May 2010 and for the purported foreclosure in July 2010 defamed Wolf, causing her public shame and embarrassment and considerable emotional harm."  Am. Compl. ¶ 37.  The relevant advertisement stated:

> In execution of a Deed of Trust . . . from ELAYNE WOLF dated May 14, 2007 . . . the undersigned appointed Substitute Trustee will offer for sale at public auction at the front of the Circuit Court building for the County of Albemarle located at 501 E. Jefferson Street, Charlottesville, Virginia on July 21, 2010 . . . .

*Id.*  In Virginia, the elements of common law defamation are: the (1) publication of (2) an actionable statement with (3) the requisite intent.  *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (applying Virginia law).  A statement is actionable if it contains a *false* assertion of fact that "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him."  *Id.*  "[M]erely offensive or unpleasant statements" are not defamatory; rather, defamatory statements "are those that make the plaintiff appear odious, infamous, or ridiculous."   *Id.* (citation omitted).  Furthermore, "speech which does not contain a provably false factual connotation, or statements which cannot reasonably be interpreted as stating actual facts about a person cannot form the basis of a common law defamation action."  *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136 (1998).  Under Virginia law, defamation must not only be particularly pled, but the pleading must set out the exact allegedly defamatory words spoken or written.  *Fuste v. Riverside Healthcare Ass'n*, 265 Va. 127, 134, 575 S.E.2d 858, 862 (2003).

In the instant case, Wolf alleges that the advertisement of the foreclosure sale was false because her home was not subject to foreclosure by her reading of the terms of the deed of trust. Even accepting this contention as true for the purposes of argument, Wolf has not pled sufficient

facts to make out a claim for defamation.   At bottom, the statement contained within the advertisement that a foreclosure sale would be conducted was patently true, regardless of the legitimacy of the sale.   Moreover, Wolf was, by her own admission, unquestionably in default. Thus, publication of a foreclosure sale notice was justified by Wolf's failure to make payments on the loan.   Absent a false statement about her, the notice cannot support a defamation claim.

Further, even if Wolf had sufficiently alleged that the publication of the foreclosure sale contained a false statement, her defamation claim must be dismissed because she has asserted that the foreclosure sale notice caused her embarrassment, public shame, and emotional harm without any supporting facts or contentions.   In *Blagogee v. Equity Trs., LLC*, No. 1:10-cv-13, 2010 U.S. Dist. LEXIS 114233, at *16–19 (E.D. Va. July 26, 2010), the court dismissed a similar claim that the publication of a foreclosure sale notice constituted defamation.   In that case, the plaintiffs alleged, with more detail than Wolf offers here, that the publication of the notice "made them feel odious and appear ridiculous around their friends and colleagues, and at social events."   *Id.* at *18.   Nevertheless, the court held that this allegation did not satisfy the requirement that the allegedly defamatory statement tend to harm the plaintiffs' reputations so as to lower them in the estimation of the community or to deter third persons from associating or dealing with them.   *Id.*   The same can be said about Wolf's allegation in the case at hand.

Finally, in order to make out a claim for defamation, a plaintiff must allege that the defendant had the "requisite intent."   *Chapin*, 993 F.2d at 1092.   However, in the instant case, Wolf has alleged no facts to support the notion that PFC had the requisite intent to defame her. Accordingly, Wolf's defamation claim must also be dismissed.[15]

---

[15] It should be noted that because Wolf does not break down her claims into counts, her amended complaint could be construed as alleging defamation by Bank of America (formerly BAC) and Fannie Mae as well.   To the extent Wolf does so, any such claims are dismissed as she does not allege that either BAC or Fannie Mae ever published any statements about her.

### F.  Breach of the Implied Covenant of Good Faith and Fair Dealing

According to Wolf, the note and accompanying deed of trust contained an implied covenant obligating the holder of the note (and any entity acting as creditor) to "treat Wolf with good faith and fair dealing."  Am. Compl. ¶ 17.  Wolf alleges, without any specification or elaboration, that the actions of BAC generally, as outlined in her amended complaint, resulted in a breach of this obligation.  Am. Compl. ¶ 38.

Wolf bases the existence of this implied covenant on Virginia Code § 8.1A-304, which states that every contract, like the note here, that is governed by the Uniform Commercial Code ("U.C.C.") "imposes an obligation of good faith in its performance and enforcement."  *See also Enomoto v. Space Adventures, Ltd.*, 624 F. Supp. 2d 443, 450 (E.D. Va. 2009) ("In Virginia, every contract contains an implied covenant of good faith and fair dealing.").  Under Virginia law, the U.C.C. term "good faith" is defined as "honesty in fact in the conduct or transaction concerned."  Va. Code § 8.1A-201(20).  The duty of good faith in the context of secured transactions requires the exercise of "honesty in fact and the observance of reasonable commercial standards of fair dealing."  Va. Code § 8.9A-102(a)(43).

However, when parties to a contract "create valid and binding rights, one party does not breach the U.C.C.'s obligation of good faith by exercising such rights."  *Charles E. Brauer Co. v. NationsBank of Va., N.A.*, 251 Va. 28, 35, 466 S.E.2d 382, 386 (1996).  In fact, "an implied covenant of good faith and fair dealing is inapplicable to those rights."  *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385, 493 S.E.2d 516, 520 (1997).  Further, an implied covenant of good faith and fair dealing "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that otherwise do not exist."  *Skillstorm, Inc. v. Elec. Data Sys., LLC*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009).  That being said, "in Virginia, as elsewhere, []

- 23 -

although the duty of good faith does not prevent a party from exercising its explicit contractual *rights*, a party may not exercise contractual *discretion* in bad faith, even when such discretion is vested solely in that party." *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 542 (4th Cir. 1998) (interpreting Virginia contract law).

In *Ward's*, in which the court found that the implied covenant was inapplicable, the only conduct on the defendant's part that the court addressed was explicitly authorized by the underlying contract in that case.  254 Va. at 385, 493 S.E.2d at 520.  And in *Charles E. Brauer Co.*, the court similarly did not allow a claim for breach of the implied covenant because the plaintiff argued that the defendant's exercise of its contractually-afforded rights was arbitrary, but not dishonest per se.  251 Va. at 35, 466 S.E.2d at 386.  In the case at hand, Wolf is presumably alleging more than the mere exercise of contractual rights by BAC (and indeed she must in order to state a claim successfully).  Rather, Wolf appears to be claiming that BAC acted outside of the scope of the rights conferred upon it by the note and deed of trust.  As such, Wolf maintains, a claim for breach of the implied covenant of good faith and fair dealing has been adequately pled.

However, as I previously explained, MERS had authority to assign the note to BAC, and BAC had authority to appoint PFC as substitute trustee.  In other words, it was within BAC's contractual rights under the note and deed of trust to act as it did, including its decision to appoint PFC and its request thereafter that PFC begin taking steps towards foreclosure. Moreover, aside from possibly her allegation that two pages of the document appointing PFC may not have been attached at the moment the second page was signed, Wolf has failed to plead facts sufficient to demonstrate how BAC exercised its contractual discretion in bad faith, acted dishonestly, or dealt with Wolf unfairly.

Although it is, concededly, an ambiguous term, "good faith" at least includes "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party [to a contract]."  Restatement (Second) of Contracts § 205 cmt. a (1981).  Surely a "justified expectation" of a party, like Wolf, who contracts for the receipt of a mortgage loan by putting her home up as collateral is that the lender (or its nominee or assignee) may initiate foreclosure proceedings through a trustee upon default.  Even if I were to accept Wolf's contention that there were procedural irregularities associated with the transactions over which BAC presided, that, in itself, is not enough to make out a claim for breach of this implied covenant.  Therefore, this claim too must be dismissed.

## IV.  Conclusion

For the reasons stated herein, Defendants' motions to dismiss (docket nos. 34, 36) shall be granted.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

Entered this ___23rd___ day of November, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE